IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN RE: MINH VU and        :
THANH HOANG
_____ :
MINH VU HOANG
    Appellant          :

    v.                 :    Civil Action No. DKC 12-3184

GARY A. ROSEN             :
    Appellee

                      :

**MEMORANDUM OPINION**

Appellant Minh Vu Hoang, a debtor in the underlying bankruptcy case ("Debtor"), appeals from separate orders entered by United States Bankruptcy Judge Thomas J. Catliota on September 20, 2012, granting a turnover motion filed by Appellee Gary A. Rosen, the chapter 7 trustee ("the Trustee" or "Mr. Rosen"), and denying Debtor's motion *in limine* to exclude the testimony of the Trustee's expert witness. Because the facts and legal arguments are adequately presented in the briefs and record, oral argument is deemed unnecessary. *See* Fed.R.Bankr.P. 8012; Local Rule 105.6. For the reasons that follow, the orders of the bankruptcy court will be affirmed.

## I. Background

On May 10, 2005, Debtor filed a voluntary petition under chapter 11 of the bankruptcy code in the United States Bankruptcy Court for the District of Maryland. She served as

debtor-in-possession from the date of filing until Mr. Rosen was appointed chapter 11 trustee on August 31, 2005. The case was converted to chapter 7 on October 28, 2005, and Mr. Rosen was named chapter 7 trustee.[1]

At some point thereafter, the Trustee learned that Debtor had been engaged, both pre and post-petition, in a real estate "flipping" scheme. Typically, she would purchase a parcel of distressed property at a foreclosure sale; title that property in the name of a sham business entity under her control; and rehabilitate and sell the property for substantial profit, often transferring the proceeds to a different entity through which she would then purchase another property. This process, or something similar to it, was repeated many times; Debtor used literally hundreds of sham business entities to "flip" hundreds of properties. Unfortunately, she failed to report this income to the IRS and her interest in most of the business entities and associated properties was not reflected in her bankruptcy schedules or statement of financial affairs.

When the Trustee's preliminary investigation revealed that Debtor had "utilized dozens, if not scores, of shell entities in

_____

[1] Debtor's husband, Thanh Hoang, separately filed a voluntary chapter 11 petition on July 12, 2005. That case was also converted to chapter 7, and Mr. Rosen was appointed as the trustee. On September 28, 2005, the bankruptcy court ordered that Mr. and Mrs. Hoang's bankruptcy estates be jointly administered.

connection with [her] purchase and sale of [] properties," he moved, on January 17, 2006, for authority to employ Marion Hecht Clay (now Marion Hecht ("Ms. Hecht")) as a forensic accountant "[i]n an effort to bring order and clarity to the tangled affairs of the Debtor[.]" (Bankr. Case No. 05-21078, ECF No. 381, at ¶¶ 6, 7). Attached to this motion was a copy of Ms. Hecht's curriculum vitae, reflecting her extensive experience in the field of forensic accounting and qualifications as an expert witness. (*Id*. at ECF No. 381-2). That motion was granted, without opposition, on February 6, 2006. (*Id*. at ECF No. 409).

On September 25, 2006, the bankruptcy court issued a scheduling order, requiring, *inter alia*, that the Trustee "serve his expert witness's statement of opinions and conclusions by October 11, 2006." (*Id*. at ECF No. 648). On October 11, the Trustee filed a document entitled "Line Filing Trustee's Expert Witness' Statement of Opinions and Conclusions," attaching Ms. Hecht's statement and, once again, a copy of her curriculum vitae. (*Id*. at ECF No. 674). The statement recites that Ms. Hecht's investigation, which was still ongoing, had "identified approximately one thousand purchases of properties at public auction by [Debtor and associates] during the period from 1999 through 2006" and "more than 200 separate putative entities (*i.e.*, general partnerships, limited partnerships, limited liability companies, corporations, *etc*.) which have been

utilized by [Debtor] for said purchases and sales." (*Id*. at 2).
Ms. Hecht opined that Debtor "show[ed] a near complete disregard
for the separate identity of each individual and business entity
utilized in connection with the purchase and resale of the []
properties"; that "disbursements [] from the . . . resale of
[the] properties [we]re made to persons and entities with near-
complete disregard for those persons putatively in ownership or
title with respect to each said property"; that "multiple items
of payment (*i.e.*, checks, money orders, *etc*.) of diverse origin
[we]re utilized to purchase properties in the names of yet other
individuals or entities"; and that "third-parties dealing with
[Debtor and her associates] d[id] not differentiate between
[Debtor and her business entities or agents]" and "treat[ed] all
of [them] as a single entity without differentiation." (*Id*.).
"[D]espite the allegedly separate character of the many
[associated business] entities," Ms. Hecht's investigation found
that "all share common control by Minh Vu Hoang." (*Id*. at 3).
No objection was filed with respect to Ms. Hecht's statement.

At the same time Ms. Hecht was conducting her
investigation, the IRS was conducting an overlapping
investigation of Debtor's failure to report the proceeds of
these transactions on her tax returns. On April 11, 2007,
Debtor was indicted on charges related to tax and bankruptcy
fraud. She subsequently pleaded guilty to conspiracy to defraud

an agency of the United States, in violation of 18 U.S.C. § 371. Attached to her plea agreement was a statement of facts in which Debtor admitted, *inter alia*, that she:

> purchased and sold hundreds of foreclosure properties during 2000 through 2006, using the names of her agents, her entities, and other nominees on certain documents related to the purchase of foreclosure properties. She also used and recycled the names of partnerships and limited liability companies, often reforming the same company with different partners or different asset allocations to conceal her involvement in the purchase and sale of foreclosure properties. In that way, among others, she concealed her control over these assets, and the income generated therefrom, from the IRS and the Bankruptcy Trustee.

(Crim. No. DKC 07-0172, ECF No. 175, at 1). She was sentenced to a term of imprisonment of sixty months.[2]

Based largely on Ms. Hecht's forensic analysis, the Trustee filed approximately seventy adversary proceedings in attempting to recover estate assets fraudulently concealed by Debtor. In one such proceeding, the Trustee sought turnover of estate property from David Dahan, who allegedly assisted Petitioner in continuing her scheme, post-petition, through a series of real estate transactions. A portion of the proceeds from the post-petition acquisition and sale of one property was traced to a

---

[2] Debtor was released from incarceration in May 2013. She is currently serving a three-year term of supervised release.

quantity of diamonds purchased by Mr. Dahan for Debtor.  As this

court summarized on appellate review:

> Upon the request of Debtor, Mr. Dahan
> created Appellee Maia, LLC ("Maia"), for the
> purpose of "funnel[ing]" proceeds of the
> sale of properties "as part of [Debtor's]
> scheme to hide her assets from the Trustee."
> Two other business entities "owned (in whole
> or in substantial part) and controlled" by
> Mr. Dahan — Appellees Rokama, LLC
> ("Rokama"), and Raymonde, LLC ("Raymonde") —
> were also used by Debtor for similar
> purposes.
>
>     . . . .
>
> The first property, located at 3119
> Parkway, Cheverly, Maryland ("Parkway"), was
> purchased at a foreclosure sale on December
> 15, 2005. The successful bidder was
> Rok[o]ma, LLC, a business entity created and
> controlled by Debtor. While the HUD-1
> settlement statement identified "Rok[o]ma,
> LLC," as the purchaser, title to the
> property was conveyed to Rokama, an entity
> controlled Mr. Dahan.[3] On or about March 7,
> 2007, Rokama sold Parkway for $371,000,
> receiving a total of $338,518.78 from the
> sale. Of that amount, $146,000 was used to
> pay down a home-equity line of credit in the
> name of Mr. Dahan and his wife, Appellee
> Sarit Dahan (together, "the Dahans"). On or
> about May 3, 2007, Mr. Dahan drew $146,000
> from the same line of credit to obtain a
> cashier's check, which, in turn, was used by
> ASA, LLC — another of Debtor's entities – to
> purchase a property in Annapolis, Maryland.
> The remainder of the sale proceeds,

---

[3] Note the distinction between the similarly-named "RokAma,"
created by Mr. Dahan at the behest of Debtor, and "RokOma,"
created by Debtor herself.  In the instant record, Ms. Hecht's
testimony states this distinction somewhat differently (*i.e.*,
"RAkama" versus "ROkama"), but it suffices to say that these
were distinct entities with similar names.

> $192,518.78, was deposited into a bank
> account in the name of Rokama. Mr. Dahan
> used $180,000 of those funds to purchase a
> quantity of diamonds from his brother, a
> diamond merchant in Israel, which he then
> delivered to Debtor.

*In re Minh Vu Hoang*, 469 B.R. 606, 609-10 (D.Md. 2012) ("*Dahan*")

(internal footnotes and record citations omitted).[4]

The same diamonds that were tangentially related to the adversary proceeding against Mr. Dahan are directly at issue in the instant appeal. On December 16, 2010, the Trustee filed, in the main bankruptcy case, a motion to compel Debtor to turnover diamonds and other jewelry, valued at over $500,000.00, that she allegedly acquired in six separate transactions. (ECF No. 5-3). Following discovery, the Trustee concluded that five of those transactions had been made through an associate of Debtor's who had since relocated to Vietnam and was not available. Thus, he proceeded only on the basis of the transaction involving approximately forty-eight carats of diamonds that Debtor obtained through Mr. Dahan.

The bankruptcy court held an evidentiary hearing on the turnover motion, and related motions, on a series of dates from December 1, 2011, to March 9, 2012. Debtor, proceeding *pro se*,

---

[4] The court ultimately affirmed the bankruptcy court's partial dismissal of the turnover action, finding that the proceeds the Trustee sought to recover from Mr. Dahan had been transferred, as that term is defined under the bankruptcy code, and therefore could not be recovered through the turnover provision of 11 U.S.C. § 542(a).

was incarcerated at that time and participated in the proceedings by telephone.

On the first hearing date, the court initially considered Debtor's challenge to a petition filed by Ms. Hecht and her staff, seeking fees for "Marion Hecht, 6.3 hours, Mary Ellen Redman, 3.6 hours, and Timothy Kelley, 339 hours[.]" (ECF No. 5-34, at 20).[5] In support of the petition, Judge Catliota asked the Trustee to call Timothy Kelley as a witness:

> I've heard from Ms. Hecht many times and I've certainly heard her testify as an expert in many adversary proceedings. I know her background and experience. I think

---

[5] The astronomical fees associated with "unravel[ling] the vast and tangled web of fictitious and fraudulent activities by the Debtor" has been a constant source of concern for the bankruptcy court. (Bankr. Case No. 05-21078, ECF No. 1371, at 10). Ironically, it is Debtor herself who has repeatedly challenged the payment of such fees. In light of the certainty that Debtor will not receive any distribution from the estate at the end of the case, the bankruptcy court has questioned whether she has standing to challenge any distribution in the bankruptcy case. It ultimately concluded that because she waived discharge, the "bankruptcy actions could have an effect on the amount of the nondischarged claims that [she] remains obligated to pay once the automatic stay is terminated." (*Id*. at 13). Thus, in the perverse world of Debtor's bankruptcy case, she has standing to challenge the payment of fees to the forensic accountants – who are needed to investigate the origin of assets due to her own unlawful conduct and whose investigation she has obstructed at every conceivable turn – because the payment of those fees diminishes the amount that will be available to distribute to creditors, which will, in turn, increase the amount Debtor owes those creditors when the case is over. Adding to the irony is the fact that Debtor's repeated and often frivolous challenges inevitably result in even greater fees, adding to the millions of dollars she will eventually owe, which the creditors – primarily, the government – are unlikely to collect.

> given the importance of this case and the
> forensic accountants, I'd like to hear from
> Mr. Kelley.

(*Id.* at 22-23).

Mr. Kelley testified that he was a senior associate at the accounting firm Dixon Hughes Goodman and that he had been working on Debtor's case, under Ms. Hecht's supervision, for over four years. (*Id.* at 23). He asserted that he held a bachelor's degree, that he was a certified fraud examiner, and that he was enrolled in business school. (*Id.* at 24). In response to the court's inquiry as to whether "the tracing that's been done" with respect to the amounts billed in the petition was similar to that "done in the adversary proceedings that have been filed," the witness testified:

> Absolutely. After four and a half years[,]
> I'd say that – I wouldn't call my memory
> encyclopedic because this is so voluminous,
> but of all the people that have worked on
> the case, I do a great deal of the work and
> I'm very familiar with it.

(*Id.* at 26).

Judge Catliota precluded Debtor from questioning Mr. Kelley regarding his credentials as a forensic accountant, observing that he had testified that he was a certified fraud examiner. (*Id.* at 27). Debtor complained that there was a lack of clarity regarding "who is running the show," in light of the fact that the majority of hours were billed by Mr. Kelley, rather than Ms.

Hecht. (*Id.* at 28). Counsel for the accounting firm argued that Debtor's position in this regard was "counter-intuitive because she's saying the compensation is excessive and then I hear her complaining that Ms. Hecht, who has the much higher hourly rate, is not spending enough time on the engagement[.]" (*Id.* at 30).

In approving the fee application, Judge Catliota explained:

> This case, as I said earlier, is really a forensic accounting case. As [counsel for the Trustee] said at the beginning of this hearing, there were five properties [listed] on [Debtor's bankruptcy] schedules in this case and the trustee has so far sold 54 and has, according to [counsel], 13 more to sell. I certainly am aware of many, many of those because I have presided over 70 plus adversary proceedings, many of which involved incredibly detailed analytical forensic accounting to trace funds through fictitious entities to find properties of the estate that had not been disclosed.
>
> . . . .
>
> With respect to the particular fee period, I find that these are reasonable and necessary expenses of the estate. Mr. Kelley, who has taken a greater and greater role, I wanted to hear from him just to get familiar with him but it's obvious that he has been involved in this case on[,] if not an everyday basis, close to a daily basis for four years. He has a tremendous amount of knowledge about the case and he's billing at $150 an hour which is considerably less than Ms. Hecht.
>
> So the extent that work is shifting to him and he's doing it, I think it is

> beneficial to the estate that he is doing this.

(*Id*. at 31-32).

After considering Debtor's objections to the fee petition filed by the Trustee, the court turned to the Trustee's turnover motion. Counsel for the Trustee stated that he would call two witnesses in support of that motion: Mr. Dahan and Ms. Hecht.

Mr. Dahan testified that he had known Debtor since 1990 and that she approached him with a business opportunity in 2005. Specifically, "she asked [him] if [he] wanted to come in and do some real estate deals with her and [he] said yes[.]" (*Id*. at 56). Upon Debtor's direction, Mr. Dahan had his attorney establish Rokama, LLC, "[t]o purchase some real estate." (*Id*. at 57). The entity was not involved in any business transactions, however, until on or about March 15, 2007, when Debtor deposited $192,518.78 into Rokama's bank account. According to Mr. Dahan, Debtor "wanted to do some business in real estate and she wanted me to help her do real estate transactions, her and I, and then she put in the money." (*Id*. at 58-59). Soon thereafter, Debtor asked Mr. Dahan "if [he] knew somebody who sells diamonds," and he responded that his brother was a diamond broker in Israel with a company called Dahan Yosef Diamond. (*Id*. at 61). Debtor "asked [Mr. Dahan] to purchase diamonds for her" using up to $180,000 of the funds she

deposited into the Rokama account. (*Id.*). Mr. Dahan wrote a check in the amount of $180,000, drawn on the Rokama account, to Dahan Yosef Diamond, which he personally delivered to his brother in Israel. Approximately three weeks after he returned home, "a brown box [was] delivered to [his] house, and then [he] called [Debtor] and told her that the package of diamonds [had] arrived[.]" (*Id.* at 63-64). Debtor picked up the box the next day and called him two days later, seeking "specification of each diamond that she bought[.]" (*Id.* at 66). Mr. Dahan contacted his brother, who faxed an invoice, on July 5, 2007, "for a single lot of polished diamonds, 48.070 carats, valued at $171,000," with specifications for each. (*Id.* at 65). Mr. Dahan gave the invoice to Debtor, who later called to report a positive appraisal of the value of the diamonds she had received. Through Mr. Dahan, the Trustee introduced a number of exhibits, including the deposit ticket, showing Debtor's deposit of $192,518.78 into the Rokama account on March 15, 2007 (ECF No. 5-4); the cancelled check to Dahon Yosef Diamond, dated March 28, 2007, in the amount of $180,000 (ECF No. 5-5); and the invoice, dated July 5, 2010 (ECF No. 5-6).

At the conclusion of Mr. Dahan's direct testimony, the bankruptcy court advised Debtor that it would permit her to cross-examine the witness by phone. Debtor complained, however, that she did not have a witness list or copies of any of the

Trustee's exhibits. (ECF No. 5-34, at 71). The bankruptcy court directed counsel for the Trustee to send her copies of all exhibits and continued the hearing until they had been received and reviewed. (*Id*. at 73).[6]

At the next hearing date, January 31, 2012, counsel for the Trustee called Marion Hecht to the witness stand.[7] During voir dire, Ms. Hecht testified that she had an MBA degree, that she was a certified public accountant, that she was a certified fraud examiner, that she had extensive forensic accounting experience and had been qualified as an expert in that field on numerous prior occasions, and that she had been involved in Debtor's case since early 2006. (ECF No. 5-32, at 33-35).[8] At the conclusion of voir dire, the court ruled as follows:

> I am going to qualify her as an expert witness under Federal Rule[] of Evidence 702. . . . Ms. Hecht has appeared before me on many times and she has been qualified as an expert many times.

---

[6] After receiving the Trustee's exhibits, Debtor was provided the opportunity to cross-examine Mr. Dahan.

[7] Debtor objected on the grounds that Ms. Hecht was a surprise witness and that an expert report had not been produced. The court overruled the objection, reasoning, "it can't be a surprise to anyone in this courtroom or participating in this hearing that Ms. Hecht is being called to testify." (*Id*. at 31). On February 8, 2012, it issued an order denying Debtor's oral objection to Ms. Hecht's testimony. (ECF No. 5-28).

[8] Debtor was permitted to conduct extensive voir dire of the witness. (*Id*. at 35-41).

> And the record will reflect that there
> has been a number of occasions where I have
> expressed my view that the work done by Ms.
> Hecht and her team has been outstanding in
> this case in doing very, very difficult
> forensic accounting and forensic analysis. .
> . .
>
> And that some 66 adversary proceedings
> and the numerous times which she has been
> offered as an expert in those cases and the
> numerous times – each time, where I have
> accepted her as an expert witness. And so,
> based on all of that, and while trying I
> know to keep with the record here, within
> this record, I am going to approve her as an
> expert under Rule 702.

(*Id.* at 41-42).

Ms. Hecht testified that, in early 2006, she was asked by the Trustee to "investigate the extent of the assets in the bankruptcy estate and to determine if any assets were not in the estate and also if any assets were transferred out of the estate." (*Id.* at 57). Regarding the evolution of her methodology, she stated:

> I first tried to understand who the key
> players are or were in this investigation
> and I met with Mr. Rosen to review the
> documents that he had in his possession. I
> learned that the IRS, the Internal Revenue
> Service[,] had subpoenaed records from
> Gemini [Title].[9] I asked to review them
> with my team, met with the IRS agent, Mr.
> Hessler, spent time in his office with my

---

[9] As explained in an appeal from another adversary proceeding, Gemini Title & Escrow, LLC, handled closings for many of Debtor's real estate transactions. *See In re Hoang*, Civ. No. DKC 12-0593, 2013 WL 1105021, at *1 (D.Md. Mar. 15, 2013) ("*Gemini*").

> team, going through the files and c[u]lling
> out from the files the documents that [she
> identified as] significant to the
> investigation that the IRS was not initially
> interested in.

(*Id*. at 58). In the process of "[g]oing through the boxes of documents" subpoenaed by the IRS, she "pulled out the documentation in support of the flow of funds." (*Id*. at 59). In analyzing this material, she noted a number of persons and entities through which Debtor appeared to be conducting transactions and, over time, that list, which she shared with the IRS, "grew to several hundred associated persons and entities." (*Id*. at 60). When each new entity was identified, Ms. Hecht "made the recommendation to the regulators that subpoenas be issued to [associated] substitute trustees, title companies, and banks." (*Id*. at 61). As the investigation continued to expand, she "had to look at about a thousand pieces of property because the sale proceeds of [a given property] might have been disbursed on 10 different instruments going into 10 different properties and then those properties were purchased with additional funds [and] ultimately sold, [with the] proceeds disbursed." (*Id*. at 64).

With regard to tracing the diamond transaction at issue, Ms. Hecht testified:

> There are several sources that I
> investigated. One was a black and white
> notepad that was seized by the regulators

and in that notepad were handwritten notes from Ms. Hoang as to different property transactions.

One involved David Dahan and it talked about several entities and different transactions. So again, we included the names of those entities, [two] of which [were] Rokama and [Maia]. And we then included in our subpoena requests to the different banks and the title companies [associated with] those named to get additional information.

We discovered that [3119 Parkway] in Cheverly, Maryland[,] was a property purchased ostensibly in the name of Rakama or Rokama – the names are similar and some of the documents might have an O or an A but we can generally say Rokama. . . . [W]e saw where the money from Pinnacle Title ultimately was deposited into a Rokama account at Mercantile Potomac Bank and it is account number 4351. . . . And by sending a request for a subpoena to Mercantile Potomac Bank, we got all the bank records for Rokama, account 4351[,] to try to determine where the $192,518.78 ultimately went. . . . We could see that $180,000 represents a check with the payee Dahan Yosef Diamond dated March 2007 and the destination was a bank in Israel.

(ECF No. 5-32, at 73-74).

Looking back, Ms. Hecht was able to vouch the $192,518.78 deposit in the Rokama account to a transaction with Pinnacle Title Company, identifying a HUD1 settlement statement for the sale of property at 3119 Parkway by Rokama. She obtained from Pinnacle Title disbursement records with respect to that transaction, which showed a partial disbursement payable to the

16

Rokama account in the amount of $192,518.78.  Over the remainder of the hearing on January 31 and through the next hearing date, February 1, Ms. Hecht testified in painstaking detail regarding numerous transactions and properties she investigated to determine the source of funds for the Parkway property.  At the end of the hearing on February 1, counsel for the Trustee asked her whether, "as a result of [her] investigation as [she had] described it using the methodology that [she] described and reviewing the evidence that [she had] just reviewed," she had "an opinion as to the identity of the source of the funds utilized to purchase 3119 [Parkway]."  (ECF No. 5-31, at 51). She stated in response, "My opinion is those funds belong to the Bankruptcy Estate of Minh Vu Hoang and Thanh Hoang."  (*Id*. at 52).

After Ms. Hecht concluded her direct testimony on February 8, 2012, counsel for the Trustee moved for the admission of approximately ninety exhibits, including Ms. Hecht's curriculum vitae (Exhibit 91).  Debtor confirmed that she had received all of the exhibits and stated, "I have no objection, Your Honor." (ECF No. 5-33, at 7).  Two demonstrative exhibits used throughout Ms. Hecht's testimony to illustrate the complex web of transactions were marked for identification as Exhibits 92 and 93.  Counsel for the Trustee then moved for their admission and Debtor was specifically asked if she had any objection.  She

responded, "No, Your Honor. I will have a chance to ask questions and cross examine, so at this moment, I have no objection." (*Id.* at 8-9). Debtor then conducted an extensive cross-examination of the witness.

On February 10, 2012, Debtor was permitted to present her evidence. She sought a stay of the proceedings in order to subpoena witnesses, which Judge Catliota denied:

> We are here today to finish this trial. I made it clear on February 3rd, I believe it was, the transcript at docket 272, pages 115 to 122 reflect that today was going to be the day we were going to finish all testimony and we were going to conclude this trial.
>
> So if you don't have witnesses here, then – as I said to you that day, this is your case in chief; what do you want me to consider by way of evidence, do you have any evidence you want me to consider, and so now I'm going to turn to you and ask do you have any evidence you want me to consider?

(ECF No. 5-30, at 25-26). Debtor attempted to call the Trustee's attorney as a witness, but the court sustained counsel's objection. Following extensive argument, Debtor was permitted to submit a memorandum, which the court said it would consider at the next hearing date.

On February 27, 2012, the court received a motion *in limine* filed by Debtor to exclude the testimony of Ms. Hecht. (ECF No. 5-24). In it, Debtor argued that the expert's testimony was inadmissible on essentially four grounds: (1) that it did not

meet the standards of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702; (2) that the Trustee did not file an expert report; (3) that Debtor initially did not have the exhibits upon which the expert testimony relied; and (4) that billing records suggested that Mr. Kelley, rather than Ms. Hecht, had conducted the bulk of the forensic analysis.

At the next hearing date, on March 2, 2012, the court acknowledged receipt of Debtor's motion, but declined to rule on it at that time. (ECF No. 5-29, at 24). Debtor was permitted to recall Ms. Hecht to the witness stand and examined her at length. At the conclusion of her testimony, she sought to call as witnesses Mr. Kelley and Daniel Barton, another member of Ms. Hecht's forensic accounting team. Because she did not subpoena the witnesses and they were not otherwise available to testify, however, she was unable to adduce any additional evidence. Debtor then rested her case.[10]

By a memorandum of decision entered September 19, 2012, Judge Catliota granted the Trustee's turnover motion. (ECF No. 5-27). After crediting the facts as established through the testimony of Mr. Dahan and Ms. Hecht, the court concluded as follows:

---

[10] Closing arguments were presented on March 9, 2012, but neither party has designated this transcript as part of the appellate record.

Here the evidence established that Hoang acquired diamonds for $180,000 in March 2007. These facts were established by the testimony of Dahan, whom the Court found entirely credible on the matters to which he testified. The testimony was fully corroborated by documents establishing the salient points of Dahan's testimony – bank statements, checks, invoices, diamond inventory, etc.

Next, Hoang's purchase of the diamonds is not subject to a turnover motion unless she acquired them with property of the estate, including its identifiable proceeds. The evidence established, and the Court concludes, that Hoang used the Pinnacle Check funds to acquire the diamonds, and the Pinnacle Check funds were identifiable proceeds of property of the estate.

(*Id*. at 13-14 (internal footnote, marks, and record citation omitted)).

By a separate order issued the same date, the bankruptcy court denied Debtor's motion to exclude Ms. Hecht's testimony. (ECF No. 1-3). Regarding Debtor's challenge based on *Daubert* and Fed.R.Evid. 702, the court ruled:

Hecht's expert qualifications were established by her resume, admitted at Exhibit 91, and testimony. The evidence established that she has the 'knowledge, skill, experience, training, [*and*] education' necessary to qualify as an expert under Fed. R. Evid. 702. Her testimony was helpful and necessary to understand the flow of funds between the various accounts and named entities. It was based on an extensive factual record consisting of checks, settlement statements, deeds, court documents and other data. The pertinent exhibits on which Hecht relied were

> available to Hoang, and were admitted into
> evidence pursuant to Fed. R. Evid. 703 or
> without objection. Hecht is a certified
> forensic examiner and applied the standard
> accounting techniques to trace the flow of
> funds through bank accounts, checks, and
> real estate transactions. . . . She applied
> the forensic accounting techniques to the
> body of exhibits and information she
> obtained. Her testimony was certainly
> relevant, and her analysis was reliable.
> Hecht's testimony readily meets the
> standards of *Daubert* and Rule 702.

(*Id*. at 5-6). With regard to Debtor's argument that no expert

report was filed, the court explained that "a motion for

turnover to compel a debtor to deliver property to a trustee is

a contested matter and not an adversary proceeding," citing

Fed.R.Bankr.P. 7001, and that, "[u]nless the Court directs

otherwise, the expert disclosures required by [] Federal Rule of

Civil Procedure 26(a)(2) are not applicable to contested

matters," citing Fed.R.Bankr.P. 9014(c) and Local Bankruptcy

Rule 9014-1. (*Id*. at 4). With respect to Debtor's contention

that she did not receive the Trustee's exhibits, the bankruptcy

court observed that "the Trustee was under no obligation to

produce his exhibits prior to the hearing" and that, in any

event, the first hearing date was continued for approximately

eight weeks to give Debtor time to receive and review the

exhibits. (*Id*. at 5). Finally, the court rejected Debtor's

challenge that Ms. Hecht was unqualified to testify because Mr.

Kelley had conducted the majority of the forensic analysis,

finding that "[Ms.] Hecht testified that the forensic analysis was performed by her or under her supervision" and that her testimony revealed that "she certainly had great command of the subject matter and the analysis[.]" (*Id.*).

On or about October 3, 2012, Debtor noted the instant appeal from the September 12 orders of the bankruptcy court. (ECF No. 1).[11] Debtor filed her appellate brief on March 15, 2013 (ECF No. 9); the Trustee filed a responsive brief on April 3 (ECF No. 10); and Debtor filed reply briefs on April 22 and 29 (ECF Nos. 12, 13).[12]

## II. Standard of Review

The district court reviews a bankruptcy court's findings of fact for clear error and conclusions of law *de novo*. *In re Official Comm. of Unsecured Creditors for Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 231 (4th Cir. 2006); Fed.R.Bankr.P. 8013. "The Supreme Court of the United States has held that

_____

[11] After she was prompted by the court, Debtor filed a motion for leave to proceed *in forma pauperis* (ECF No. 3), which the court granted (ECF No. 6).

[12] Debtor filed a motion to withdraw reference on July 29, "seek[ing] to have the United States District Court withdraw the reference to the [b]ankruptcy [c]ourt of this adversary proceeding[.]" (ECF No. 15, at 1). The Trustee subsequently moved to strike Debtor's motion. (ECF No. 16). On September 4, Debtor filed a notice acknowledging that her motion was filed in the wrong case and asking the clerk to remove it from the docket. (ECF No. 17). Accordingly, Debtor's motion to withdraw reference will be denied and the Trustee's motion to strike will be denied as moot.

'[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *In re Fitzwater*, No. 2:11-cv-00934, 2012 WL 4339559, at *2 (S.D.W.Va. Sept. 21, 2012) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)); *In re Broyles*, 55 F.3d 980, 983 (4th Cir. 1995). "On legal issues, this [c]ourt 'must make an independent determination of the applicable law.'" *In re Fabian*, 475 B.R. 463, 467 (D.Md. 2012) (quoting *In re Jeffrey Bigelow Design Group, Inc.*, 127 B.R. 580, 582 (D.Md. 1991)). With respect to the bankruptcy court's application of law to the facts, the district court reviews for abuse of discretion. *In re Fabian*, 475 B.R. at 467 (citing *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992)).

## III. Analysis

In support of her appeal, Debtor has filed what she characterizes as an "informal" opening brief (ECF No. 9); a "reply" brief (ECF No. 12), in which she raises a number of issues for the first time; and a surreply (ECF No. 13), which she labels as a "continuation" of the initial reply. *See A Helping Hand, LLC v. Baltimore County, Md.*, 515 F.3d 356, 369 (4th Cir. 2008) ("It is a well settled rule that contentions not raised in the argument section of the *opening brief* are

abandoned" (emphasis in original; internal marks and citation omitted)); Local Rule 105.2(a) (a surreply is not permitted absent leave of the court). Generally, these documents are rife with conclusory allegations unsupported by any facts or record citations, *see* Fed.R.Bankr.P. 8010(1)(E) (requiring, *inter alia*, that an appellate brief contain "citations to the authorities, statutes and parts of the record relied on"); they advance a number of arguments that were never presented before the bankruptcy court, *see Levy v. Kindred*, 854 F.2d 682, 685 (4th Cir. 1988) ("[a]bsent exceptional circumstances, an appellate court will not consider an issue raised for the first time on appeal"); and, in some instances, they relate to orders other than those appealed from (*i.e.*, the February 8, 2012, order denying Debtor's oral motion to exclude Ms. Hecht's testimony (ECF No. 5-28); the December 1, 2011, order granting the fee petition filed by the forensic accountants (ECF No. 5-34, at 31-32)).

In distilling the cognizable appellate arguments with respect to the order denying Debtor's motion *in limine* to exclude Ms. Hecht's testimony (ECF No. 1-3), the court focuses on the arguments specifically addressed by the bankruptcy court, which it frames as follows:

> (1) that the bankruptcy court abused its discretion in denying Debtor's motion to exclude Ms. Hecht's testimony because:

(a) her methodology was both unreliable and unreasonably applied under *Daubert* and Federal Rule of Evidence 702;

(b) the Trustee did not provide Debtor with an expert report, as required pursuant to Federal Rule of Civil Procedure 26(a)(2);

(c) the Trustee did not initially provide Debtor with copies of the exhibits upon which Ms. Hecht's testimony relied; and

(d) Mr. Kelley, rather than Ms. Hecht, did the bulk of the accounting work about which Ms. Hecht testified.

Regarding Debtor's challenges to the turnover order, the court addresses the following claims:

(2) that the bankruptcy court erred in granting the Trustee's turnover motion because:

(a) the diamonds are not presently in her possession; and

(b) the court failed to apply the "dominion and control" test.[13]

## A.   **Debtor's Motion *in Limine***

## 1.   ***Daubert* Challenge**

In her initial brief, Debtor challenges the reliability of the forensic accounting methodology employed by Ms. Hecht, but does not identify the specific basis of her objection.  In her

---

[13] Debtor's argument that the Trustee was required to file his turnover motion in an adversary proceeding, rather than the main bankruptcy case, will be addressed in the discussion of her claim that the Trustee failed to file an expert report.

reply brief, however, she argues that the testimony "did not meet [*Daubert*'s] five non-exclusive factors." (ECF No. 12, at 5). She contends: (1) that Ms. Hecht's "methodology has never been tested"; (2) that "[h]er methodology has not been published and subjected to peer review"; (3) that "[t]he method's rate of error when it has been applied is unknown"; (4) that "[t]here was no existence of standards and controls"; and (5) that "no one knew whether the methodology or principle is generally accepted in its field." (*Id.*).

Federal Rule of Evidence 702 governs the admissibility of expert testimony. That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert*, 509 U.S. at 589, the Supreme Court held that Rule 702 imposes an obligation upon a trial judge to "ensure that any and all scientific testimony . . . is not only relevant, but

reliable." In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999), the Court applied *Daubert*'s general principles to the admissibility of technical expert evidence, such as the testimony of a forensic accountant, as well.

When applying *Daubert* to challenged expert testimony, courts typically consider four factors: (1) whether the expert opinion can be tested; (2) whether the expert opinion has been subjected to peer review; (3) the rate of error of the methods employed by the expert; and (4) whether the expert's method has been generally accepted by his or her community. *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 261 (4th Cir. 2005) (citing *Daubert*, 509 U.S. at 592-94). As *Daubert*, 509 U.S. at 593, itself cautioned, however, these four guideposts do not constitute "a definitive checklist or test." Indeed, the Court recognized that "[m]any factors will bear on the inquiry" of whether the reasoning or methodology underlying the testimony is valid. *Id.; see also Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F.Supp.2d 549, 553 (D.Md. 2011) (holding that the indicia of reliability of expert testimony "may, but need not, include" the four *Daubert* factors). Appellate courts give "great deference" to a lower court's decision to admit or exclude expert testimony under *Daubert*. *TFWS, Inc. v. Schaefer*, 325 F.3d 234, 240 (4th Cir. 2003) (quoting *United States v.*

*Barnette*, 211 F.3d 803, 816 (4th Cir. 2000); *Talkington v. Atria Reclamelucifers Fabrieken BV*, 152 F.3d 254, 265 (4th Cir. 1998)).

While it is true, as Debtor contends, that the record does not reflect the manner in which Ms. Hecht's methodology was tested, subjected to peer review, that there were standards and controls for its application, or that it was generally accepted within her field, forensic accounting is not typically a field in which controversial scientific methods are employed. *See WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1040 (8th Cir. 2011) ("Forensic accountants routinely rely, surely to no one's surprise, on the books and records and financial information . . . provided" (internal marks and citation omitted)). As the Fourth Circuit has explained, different considerations apply where, as here, a witness's expertise is based on knowledge and experience:

> A district court's reliability determination does not exist in a vacuum, as there exist meaningful differences in how reliability must be examined with respect to expert testimony that is primarily experiential in nature as opposed to scientific. Purely scientific testimony, for example, is characterized by "its falsifiability, or refutability, or testability." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (quoting K. Popper, *Conjectures and Refutations: The Growth of Scientific Knowledge* 37 (5th ed. 1989)). Thus, such evidence is "objectively verifiable, and subject to the expectations of falsifiability, peer review, and

publication." Fed.R.Evid. 702 advisory committee's note.

Experiential expert testimony, on the other hand, does not "rely on anything like a scientific method." *Id*. But this does not lead to a conclusion that "experience alone — or experience in conjunction with other knowledge, skill, training or education — may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." *Id*. While a district court's task in examining the reliability of experiential expert testimony is therefore somewhat more opaque, the district court must nonetheless require an experiential witness to "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." *Id*.

*United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007) (brackets in original).

There can be no doubt that Ms. Hecht was sufficiently qualified as an expert, or that the bankruptcy court fulfilled its gatekeeping function with respect to her testimony. As the bankruptcy court observed, Ms. Hecht's "expert qualifications were established by her resume, admitted at Exhibit 91, and testimony." (ECF No. 1-3, at 3).[14] Aside from holding an MBA

_____

[14] To the extent that Debtor seeks to challenge Ms. Hecht's curriculum vitae on appeal, her argument is unpreserved due to her failure to object when the document was admitted into evidence. (ECF No. 5-33, at 7). While the court "may, in its discretion, decide issues presented to it in a bankruptcy appeal even though the issues were not raised in the court below,"

and certifications in public accounting and forensic examination, the witness testified that she had approximately twenty years of forensic accounting experience and had been qualified as an expert in that field in numerous prior proceedings. More significantly, she had been involved in Debtor's bankruptcy case since early 2006 and Judge Catliota had the opportunity to assess both her methods and the quality of her work on numerous prior occasions. Over the course of three days, Ms. Hecht presented exhaustive testimony, supported at each step by documentary evidence, tracing the funds used to purchase the diamonds at issue, through a series of transactions, to pre-petition assets that were not disclosed by Debtor at the time she filed her bankruptcy petition. In so doing, she employed a standard accounting technique known as "vouching," which she explained was "used to describe the process of going backwards to determine the source of particular funds." (ECF No. 5-27, at 6 n. 4). Debtor points to no specific shortcoming with respect the witness's testimony that calls into question its reliability, nor could she do so on the

---

*Debartolo Properties Management, Inc. v. Devan*, 194 B.R. 46, 49 (D.Md. 1996), it declines to do so here. As noted, Ms. Hecht's curriculum vitae was first filed in Debtor's bankruptcy case on January 17, 2006, without objection (and prior to the time Debtor was incarcerated), and the witness has since testified as an expert in numerous proceedings in the bankruptcy case. Debtor's argument, over six years later, that her resume is somehow deficient is wholly meritless, if not frivolous.

instant record. As the bankruptcy court properly concluded, "[Ms.] Hecht's testimony readily me[t] the standards of *Daubert* and Rule 702." (ECF No. 1-3, at 4).

## 2. Expert Report

Debtor next takes issue with the fact that she was never provided with an expert report required by Federal Rule of Civil Procedure 26(a)(2). That rule provides, in relevant part, for disclosure of a "written report – prepared and signed by the witness – if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee involve giving expert testimony." Fed.R.Civ.P. 26(a)(2)(B). As the bankruptcy court observed, however, "a motion for turnover to compel a debtor to deliver property to a trustee is a contested matter and not an adversary proceeding," citing Fed.R.Bankr.P. 7001. (ECF No. 1-3, at 4).[15] Pursuant to Fed.R.BankrP. 9014(c), moreover, Fed.R.Civ.P. 26(a)(2), as incorporated by Fed.R.Bankr.P. 7026, is among the provisions that "shall not apply in a contested matter unless the court directs otherwise." Here, the bankruptcy court did

---

[15] Pursuant to Fed.R.Bankr.P. 7001(1), an "adversary proceeding" includes "a proceeding to recover money or property, *other than a proceeding to compel the debtor to deliver property to the trustee*[.]" (Emphasis added). Because the Trustee's turnover motion was a motion to compel her to deliver property of the estate, it was properly filed as a contested matter in the main bankruptcy case, not as an adversary proceeding.

not direct the Trustee to submit an expert report; thus, the Trustee had no obligation to do so.[16]

### 3. Receipt of Evidence

Debtor's contention that her due process rights were violated by the fact that she was not provided an advance copy of the Trustee's exhibits is belied by the record. The Trustee announced at the first hearing date, December 1, 2011, that he would be calling Mr. Dahan and Ms. Hecht to testify. When Debtor objected that she did not have copies of the evidence the Trustee planned to introduce, the court ordered that all exhibits be delivered to her, by overnight mail, and continued the hearing for approximately eight weeks to provide her time to receive and review the documents. At the next hearing date, January 31, 2012, Debtor confirmed that she had received the exhibits and conducted an extensive cross-examination of Mr. Dahan and, subsequently, of Ms. Hecht. The Trustee was under no obligation to provide her with exhibits at the outset of the

---

[16] In any event, the bankruptcy court's scheduling order, dated September 25, 2006, required the Trustee to "serve his expert witness's statement of opinions and conclusions by October 11, 2006" (Bankr. Case No. 05-21078, ECF No. 648), and the Trustee complied with that directive by timely filing Ms. Hecht's "statement of opinions and conclusions" (*Id*. at ECF No. 674). While the investigation may have been incomplete at that point, this statement, which attached the witness's curriculum vitae, satisfied many of the requirements of Fed.R.Civ.P. 26(a)(2), and Debtor cannot reasonably claim to have been surprised by the witness.

hearing and Debtor points to no prejudice that inured to her as a result of not receiving the exhibits prior to Mr. Dahan's direct testimony.

**4. Preparation for Testimony**

Debtor also takes issue, apparently on the basis of the fee petition considered on the first date of the turnover hearing, with the fact that Mr. Kelley, rather than Ms. Hecht, conducted the vast majority of the accounting work leading up to Ms. Hecht's testimony. She further alleges that he was unqualified to do that work.[17] Both Mr. Kelley and Ms. Hecht unequivocally testified, however, that Mr. Kelley worked at all times under Ms. Hecht's supervision. Mr. Kelley's testimony established, moreover, that he had been working on Debtor's bankruptcy case for over four years at the time of the hearing and that, over that time, he had developed great familiarity with the forensic

---

[17] Debtor additionally suggests, without record support, that Mr. Kelley prepared Exhibits 92 and 93, which were demonstrative aids used by the Trustee to illustrate the complex web of transactions about which Ms. Hecht testified. This argument is unpreserved due to the fact that she did not object to the admission of these exhibits, but Debtor also cannot show prejudice resulting from the admission of these exhibits where each transaction was independently supported by Ms. Hecht's testimony and corroborative evidence. *See Colgan Air, Inc. v. Raytheon Aircraft Co.*, 535 F.Supp.2d 580, 583 (E.D.Va. 2008) ("Demonstrative aids are appropriately and widely used in trials to help illustrate for the [finder of fact] matters that might otherwise be less than fully understood") (citing 2 *McCormick on Evidence* § 214 (6th ed. 2006) (purpose of a demonstrative aid is "to illustrate other admitted evidence and thus render it more comprehensible to the trier of fact")).

investigation. While he had not yet attained the credentials of his supervisor, he was well on his way, having earned certification as a fraud examiner and enrolled in a Masters-level business administration program. Furthermore, given that the bulk of the forensic analysis had been completed prior to the hearing, increased reliance on Ms. Hecht's support staff to prepare for hearings served the important goal of minimizing administrative expenditures. While the fee petition may have been probative evidence during the voir dire of Ms. Hecht, the expert's testimony amply reflected her qualifications, regardless of the extent to which she was assisted by Mr. Kelley.

Accordingly, the bankruptcy court did not abuse its discretion in denying Debtor's motion *in limine* to exclude the testimony of Ms. Hecht.

**B. The Trustee's Turnover Motion**

**1. Present Possession**

With respect to the Trustee's turnover motion, Debtor initially contends that she does not possess the diamonds in question and that she cannot be compelled to turnover that which she does not have. This argument is contrary to established Fourth Circuit case law.

As the court explained in *Dahan* and *Gemini*, among other decisions stemming from Debtor's case, "[t]he filing of a

bankruptcy petition gives rise to the creation of an estate,"
pursuant to 11 U.S.C. § 541(a). *Dahan*, 469 B.R. at 615. That
estate is comprised, in relevant part, of "all legal or
equitable interests of the debtor in property as of the
commencement of the case," no matter where such property is
located or by whom it is held. *Id*. (quoting § 541(a)(1)). In a
chapter 7 case, the trustee "essentially steps into the shoes of
the debtor with respect to her interests at the time the
petition is filed" and "it is [his] responsibility . . . to
'marshal and consolidated the debtor's assets'" for distribution
to creditors. *Id*. at 616 (quoting *In re Andrews*, 80 F.3d 906,
909-10 (4th Cir. 1996)).

The turnover provision of 11 U.S.C. § 542(a) is one of the
tools provided by the bankruptcy code to assist in that process.
It provides:

> Except as provided in subsection (c) or (d)
> of this section, an entity, other than a
> custodian, in possession, custody, or
> control, during the case, of property that
> the trustee may use, sell, or lease under
> section 363 of this title, or that the
> debtor may exempt under section 522 of this
> title, shall deliver to the trustee, and
> account for, such property or the value of
> such property, unless such property is of
> inconsequential value or benefit to the
> estate.

§ 542(a).

While some courts have held that § 542(a) compels only the turnover of property of the estate in the possession of the person or entity from whom it is sought, the Fourth Circuit is not among them.  In *In re Shearin*, 224 F.3d 353 (4th Cir. 2000), the court considered the argument of a law firm ordered to turnover year-end profits it paid, post-petition, to the debtor, a partner, on the ground that the property was no longer in its possession.  The court rejected that argument based on the plain language of the statute:

> Section 542(a) provides a broader remedy than solely the turnover of property held at the time of an adversary proceeding, which could occur well after the filing of a bankruptcy petition.  It provides that "an entity . . . in possession, custody, or control, *during the case*, of property that the trustee may use, sell, or lease under section 363 . . . shall deliver to the trustee, and account for, such property or the *value* of such property. . . ." 11 U.S.C. § 542(a) (emphasis added).  We construe the language "during the case" to refer to the entire bankruptcy case, not just the adversary proceeding. *Accord Boyer v. Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A.* (*In re USA Diversified Prods.*, Inc.), 100 F.3d 53, 55 (7th Cir. 1996) (applying section 542(a) to "[o]ne who during a bankruptcy proceeding is 'in possession, custody, or control' of property" belonging to the debtor's estate); *Redfield v. Peat, Marwick, Mitchell, & Co.* (*In re Robertson*), 105 B.R. 440, 457 (Bankr.N.D.Ill. 1989) (stating that the statute "plainly applies to estate property that was possessed by anyone 'during the case' whether or not they still have it").  The law firm in this case had possession and

control over pre-petition profits generated
in the current fiscal year before July 12,
1996, the date of the bankruptcy filing, and
retained control and possession of those
profits until year-end distribution in
December 1996 and January 1997. Accordingly,
Shearin's year-end profits, prorated to
July, 12, 1996, are subject to turnover, and
the firm, having possessed such profits must
"account for" that property "or the value of
said property." *See In re USA Diversified
Prods.*, Co., 100 F.3d at 55 (quoting section
542(a)).

*In re Shearin*, 224 F.3d at 356 (footnotes omitted).

For the same reasons, it makes no difference in the instant
case whether Debtor is currently in possession of the diamonds
sought by the Trustee through his turnover motion. The
testimony of Ms. Hecht traced the diamonds back to pre-petition
assets, thus demonstrating that they were purchased with estate
assets and, consequently, that they were property of the
bankruptcy estate. *See* 11 U.S.C. § 542(a)(6) (the "[p]roceeds .
. . of or from property of the estate" is itself property of the
estate). Mr. Dahan's testimony clearly showed that Debtor had
post-petition "possession and control" of the diamonds, which
were purchased at her behest and delivered to her according to
her specifications. Thus, Debtor, "having possessed such
[property] must 'account for' that property 'or the value of
said property,'" regardless of whether it is still in her
possession. *In re Shearin*, 224 F.3d at 356 (quoting *In re USA
Diversified Prods., Inc.*, 100 F.3d at 55).

## 2.   Dominion and Control

Debtor's argument that the bankruptcy court erred in applying the "dominion and control" test is similarly misplaced. As the court explained in *Dahan*, the Fourth Circuit has "adopted the 'dominion and control' test established by the Seventh Circuit in *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 893 (7th Cir. 1988), to determine whether a transfer has occurred, holding that 'the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes.'" *Dahan*, 469 B.R. at 622 (quoting *In re Southeast Hotel Properties Ltd. Partnership*, 99 F.3d 151, 154-55 (4th Cir. 1996)).

Unlike *Dahan*, however, the instant case did not involve the transfer of estate property.  Rather, it involved the conversion of estate property, by Debtor through a series of transactions, from pre-petition assets that she unlawfully failed to disclose at the time she filed her bankruptcy petition to her post-petition acquisition of the diamonds at issue.  Assuming, for example, that Debtor failed to disclose her pre-petition ownership of a parcel of real property that she subsequently sold post-petition, the real property itself may have been transferred – and, therefore, could only be drawn back into the estate through an avoidance action by the Trustee – but the "property of the estate" would merely be converted from Debtor's

interest in the real property to her interest in the proceeds of the sale of that property. *See Gemini*, 2013 WL 1105021, at *9 ("While it is true . . . that the proceeds at issue derived from transfers of property, the trustee was not required to avoid any post-petition transfer, pursuant to [11 U.S.C.] § 549, in order to draw the property back into the estate"). The fact that "property of the estate" may have been converted through numerous transactions prior to the diamond purchase is of no moment. The salient point is that the "property of the estate" was not subject to "transfer," as that term is defined under the bankruptcy code; thus, the "dominion and control" test, which is used to determine whether property was transferred, could have no application.

Accordingly, the bankruptcy court did not abuse its discretion in granting the Trustee's turnover motion.

**IV. Conclusion**

For the foregoing reasons, the orders of the bankruptcy court will be affirmed. A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge